USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/05/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALAN D. HALPERIN, as Litigation Trustee of the Instant Brands Litigation Trust,

Plaintiff,

-against-

CORNELL CAPITAL LLC, et al.,

Defendants.

25-CV-04890 (MMG)

**<u>OPINION & ORDER</u>**

MARGARET M. GARNETT, United States District Judge:

In March 2019, Defendant Cornell Capital LLC ("Cornell Capital") purchased Instant Brands Inc., manufacturer and seller of the Instant Pot kitchen appliance, merged it with another Cornell Capital-owned company, and named the merged entity Instant Brands. Approximately four years later, on June 12, 2023, Instant Brands filed for bankruptcy. The bankruptcy court appointed Plaintiff Alan Halperin (the "Trustee") as Litigation Trustee of the Instant Brands Litigation Trust. The Trustee was authorized to pursue certain claims held by creditors who may have been harmed by Defendants' conduct in the years preceding the bankruptcy. In this litigation, the Trustee seeks to hold Cornell Capital and affiliated individuals, certain former directors and officers of Instant Brands, and the sellers of Instant Brands Inc. liable for alleged violations of New York and Delaware law as well as the Bankruptcy Code. All Defendants have moved to dismiss the Complaint. For the reasons set forth below, the motions are DENIED.

## BACKGROUND

## I. RELEVANT FACTS[1]

### A. Cornell Capital's Purchase of Corelle Brands and Instant Brands

Defendant Cornell Capital is a private equity fund. In May 2017, Cornell Capital purchased WKI Holding Company, Inc. ("World Kitchen"), which sold various brands of household goods. Compl. ¶ 52. After purchasing World Kitchen, Cornell Capital renamed it Corelle Brands Holdings Inc. ("Corelle Brands"). *Id.* In 2017 and 2018, following Cornell Capital's acquisition, Corelle Brands' revenue declined. *Id.* ¶ 2. To facilitate Corelle Brands' growth, Cornell Capital set out to acquire an additional company that it could merge with Corelle Brands. *Id.* ¶ 53. In March 2019, Cornell Capital acquired Instant Brands Inc., along with its affiliates, for $615 million. *Id.* ¶¶ 2, 54–55. Instant Brands Inc.'s main product was an electric pressure cooker called the "Instant Pot." *Id.* ¶ 2. After purchasing Instant Brands Inc., Cornell Capital merged it with Corelle Brands and named the combined company Instant Brands. *Id.* ¶ 54.

### B. Instant Brands Inc.'s Flawed Financial Statements

Soon after purchasing Instant Brands Inc., Cornell Capital realized that the financial statements provided by Instant Brands Inc. in connection with the acquisition contained material misstatements and omissions. *Id.* ¶¶ 57–58. As they re-examined all of Instant Brands Inc.'s pre-purchase financials, employees of Cornell Capital and Instant Brands expressed serious concern about the state of the company's business. For example, CEO Ken Wilkes stated in an April 2019 email that Instant Brands Inc. "may be the most poorly operated 'successful' business

[1] The following facts are taken from the allegations in the Complaint, Dkt. No. 1-4 ("Compl."), and are assumed true for the purpose of resolving this motion.

on the planet." *Id.* ¶ 58. Wilkes also described Instant Brands Inc. as a "shit show" with "poor accounting, control, etc." *Id.* ¶ 59.

A re-audit of the company's financials showed significant flaws in the pre-purchase financials, such as an EBITDA for 2018 that was $39 million lower than represented. *Id.* ¶ 61. Based on the re-audit, Cornell Capital determined that it overpaid for Instant Brands Inc. by $237 million. *Id.* ¶ 62. After Cornell Capital threatened a lawsuit, the sellers of Instant Brands Inc. agreed to a settlement that reduced Cornell Capital's purchase price by cancelling certain non-cash components of the consideration. *Id.* ¶¶ 62, 64. Cornell Capital also filed an insurance claim for the remainder of the loss. *Id.* ¶ 66.

Instant Brands' financial situation continued to worsen after the acquisition. A 2019 slide presentation prepared by company management stated that there was "[n]o cash generated at either company" in 2019. *Id.* ¶ 71. Management further noted that "inventories worth tens of millions were not sold last year," and "hundreds of millions of shareholder value was wiped out." *Id.* ¶ 72. Instant Brands' 2020 financial performance was also poor, with the company achieving revenue lower than even the "worst case scenario" predicted by management. *Id.* ¶ 74. A variety of factors contributed to Instant Brands' financial deterioration, including saturation of the Instant Pot market and the termination of a relationship with a utility knife brand that had preciously contributed approximately $40 million annually to Corelle Brands' revenue. *Id.* ¶¶ 75–76. Additionally, in September 2020, the Consumer Product Safety Commission ("CPSC") commenced an investigation into the Instant Pot after receiving reports that it "caught fire, melted, exploded and/or blew up, posing fire and burn hazards." *Id.* ¶ 78.

Instant Brands' poor financial performance caused several parties to warn that Instant Brands' financials were overstated. For example, Instant Brands' audit partner and former

corporate controller questioned the company's $242 million financial projection for "Goodwill," which reflected the surplus between the value of Instant Brands Inc.'s assets at the time of the merger and what Cornell Capital paid for the company. *Id.* ¶¶ 83–85. Instant Brands did not impair either goodwill or the intangible assets relating to the Instant Pot brand value in the 2020 financial statements. *Id.* ¶ 88.

**C. The Parent Transfer, Special Dividend, and Seller Notes Transfer**

In 2019, Cornell Capital and Instant Brands began discussing potential dividend recapitalization scenarios. *Id.* ¶ 90. In early 2021, Cornell Capital and the investment bank Jefferies marketed a dividend recapitalization transaction to potential lenders and ultimately raised $450 million to secure a term loan that closed in April 2021 (the "Term Loan").[2] *Id.* ¶ 92. The marketing materials provided to potential lenders purportedly contained various misrepresentations and omissions, without which lenders would not have agreed to participate in the Term Loan. *Id.* These include failing "to disclose that (a) the initial purchase price of Instant Brands by Corelle Brands was greatly inflated, (b) Cornell Capital and Instant Brands represented to their R&W Insurers that they had lost $268 million due to the misstated value of the company, (c) Cornell Capital had threatened to sue the Instant Brands Sellers by way of a restructuring agreement which significantly reduced the purchase price, and (d) Pre-Acquisition Instant Brands' financial statements for 2017 and 2018 had been materially misstated and were subsequently re-audited and re-stated." *Id.* ¶ 96. Additionally, when prospective lenders inquired about Instant Brands' financials, Cornell Capital purportedly employed a strategy of

[2] Instant Brands consisted of three related entities: Instant Brands Acquisition Holdings, Inc. ("TopCo"), Instant Brands Acquisition Intermediate Holdings Inc. ("Intermediate HoldCo"), and Instant Brands Holdings Inc. ("OpCo"). Compl. ¶ 56. TopCo was the borrower on the Instant Brands Seller Notes, OpCo was the borrower on the $450 million term loan, and Intermediate HoldCo was the guarantor of that loan. *Id*. ¶ 92.

"avoid[ing] putting information in writing and crafting responses that did not reveal the magnitude of its losses and the results of the re-audited 2017 and 2018 financial statements" and "crafted responses with half-truths and omissions." *Id.* ¶¶ 104–05.

On March 21, 2021, Instant Brands' board of directors signed a resolution that authorized the company to use the $450 million Term Loan to refinance existing debt and pay a dividend to common equity shareholders. *Id.* ¶ 108. The resolution was signed by the nine members of Instant Brands' board, eight of whom would ultimately be recipients of the proposed dividend. *Id.* ¶ 109. On March 24, 2021, Cornell Capital's legal counsel circulated a draft of a memo called the "Solvency Memo," which had been prepared by Instant Brands' CFO (who was also slated to receive a portion of the proposed dividend, as well as associated bonuses). *Id.* ¶¶ 9–11, 110. The Solvency Memo analyzed whether the dividend transactions would render Instant Brands insolvent and concluded that they would not. *Id.* The Trustee alleges that the Solvency Memo was flawed in a variety of ways, including being prepared by an interested party, assuming that highly optimistic financial projections would be met through 2028, and failing to account for potential liabilities due to the CPSC investigation into Instant Brands. *Id.* ¶¶ 10, 112, 119. Instant Brands' management's projections, which underlay the Solvency Memo, were purportedly also deeply flawed, with projected revenue, adjusted EBITDA, and free cash flows all significantly overstated without any basis in actual performance. *Id.* ¶¶ 121, 126, 133.

On April 14, 2021, Instant Brands' board of directors held a meeting to give final approval for the dividends and related transactions, in purported reliance on the Solvency Memo. *Id.* ¶ 116. The proposed transactions entailed using the $450 million Term Loan and an additional $100 million of Instant Brands' cash to pay off the company's existing debt as well as to pay a $345 million dividend from one Instant Brands' entity to others (OpCo to Intermediate

HoldCo, and then on to TopCo). *Id.* ¶ 93. The Trustee refers to this transaction as the "Parent Transfer," and alleges that the Instant Brands' subsidiary company (OpCo) who was the borrower on the Term Loan and from whom the $345 million dividend amount was transferred did not receive anything in return. *Id.* According to Plaintiffs, the transaction rendered the transferor company (OpCo) insolvent. *Id.*

After these transfers, the $345 million dividend was primarily paid out to three groups: (1) Cornell Capital, along with its affiliates and co-investors, received $200 million; (2) the Instant Brands Sellers who had issued notes as part of the 2019 Instant Brands acquisition received $100 million in repayment as well as a $2 million dividend; and (3) Instant Brands' management team received a total of $4 million, as well as an additional $2 million in cash bonuses. *Id.* ¶ 94. The Trustee refers to the approximately $200 million payment to Cornell Capital and its co-investors and the payments to Instant Brands' management as the "Special Dividend." *Id.* ¶¶ 165–68. The Trustee refers to the $100 million payoff of seller notes as the "Seller Notes Transfer" and alleges that Instant Brands Directors "Robert Wang and Yi Qin received the lion's share of the proceeds of the Seller Notes Transfer." *Id.* ¶¶ 94, 109, 229.

**D. The Unsub Transaction**

Following the April 2021 dividend transactions, Instant Brands missed its revenue projections for every quarter from mid-2021 to the end of 2022, and its revenue continued to decline. *Id.* ¶ 142. By January 2023, Instant Brands was "out of money." *Id.* ¶ 146. To address Instant Brands' poor financial condition, Cornell Capital purportedly devised a scheme (the "Unsub Transaction") to transfer effectively all of Instant Brands' tangible assets—worth approximately $200 million—to newly formed unrestricted subsidiaries. *Id.* ¶ 147. The transfer would serve as collateral for a $55 million loan from Cornell Capital Partners LP. *Id.* The Unsub Transaction was approved on January 14, 2023, by a special committee that had been

established two days prior. *Id.* ¶ 150. According to the Trustee, the special committee did not include any disinterested fiduciaries nor did it have separate counsel or independent professional advice from parties not beholden to Cornell Capital. *Id.* ¶ 151. Moreover, the asset transfer was allegedly in violation of the Term Loan's credit agreement, which prohibited such transfers, and was made without notice to or the agreement of the Term Loan creditors. *Id.* ¶ 155. Finally, the Trustee alleges that the sole purpose for the Unsub Transaction was to postpone Instant Brands' inevitable bankruptcy filing until two years after the Special Dividend issued. *Id.* ¶ 147.

**E. Instant Brands' Bankruptcy**

Following the Unsub Transaction, Instant Brands' business continued to deteriorate. *Id.* ¶ 156. Moody's downgraded Instant Brands' credit rating due to the "elevated risk of default" and the Unsub Transaction was viewed negatively by the financial press and markets. *Id.* On February 15, 2023, Instant Brands' board of directors convened a special meeting in which the directors agreed that the Unsub Transaction "postpone[d] an inevitable comprehensive restructuring." *Id.* ¶ 158. On June 12, 2023, Instant Brands filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas. *Id.* ¶ 161. At the time of the bankruptcy filing, the remaining balance on the Term Loan was $391 million, and the lenders ultimately recovered only 7–9% of the value of their claims. *Id.* ¶ 162. The bankruptcy court appointed the Trustee to seek redress for any creditors who were harmed by Defendants' conduct. *Id.* ¶ 16. The Trustee also brings claims on behalf of the lenders who participated in the Term Loan (the "Assigned Lenders"). *Id.* ¶ 18.

**F. The Trustees' Claims**

The Trustee brings nine claims on behalf of the bankruptcy estate, for the benefit of all creditors, and two claims on behalf of the Assigned Lenders. The Trustee brings three claims for actual fraudulent transfer (Counts One, Two, and Three) and three claims for constructive

fraudulent transfer (Counts Four, Five, and Six), all in violation of Sections 544 and 550 of the Bankruptcy Code and N.Y. D.C.L. §§ 273–75, and based on (1) the Special Dividend; (2) the Parent Transfer; (3) the Seller Notes Transfer; and (4) the Unsub Transaction. *Id.* at 67–77. The Trustee also alleges that the Special Dividend was an illegal dividend (Count Seven), that certain individual Defendants breached their fiduciary duties by approving the Special Dividend and Unsub Transaction (Count Eight), and that Cornell Capital aided and abetted the breach of fiduciary duty (Count Nine). *Id.* at 77–83. On behalf of the Assigned Lenders, the Trustee brings claims for tortious interference with contract and fraudulent inducement in connection with the Term Loan credit agreement (Counts Ten and Eleven). *Id.* at 83–86. The Trustee brings these claims against three groups of Defendants: the "Cornell Defendants" (Cornell Capital, LLC, Cornell Capital Partners, LP, CC WK Co-Invest, LP, Henry Cornell, Justine Cheng, and Rodrigo Bravo), the "Seller Defendants" (Agate Informatics Corp., 4060288 Canada Inc., 7326998 Canada Inc., Robert Wang, Yi Qin, and Christopher Larocque), and the "Former D&O Defendants" (Benoit Gadbois, Nicholas Hewitt, Jeffrey Kist, William Hess, Catherine Landman, Kenneth Wilkes, Lawrence McRae, John Dubel, and Younghoon Park).

## II. PROCEDURAL HISTORY

The Trustee initiated this action on November 13, 2024 in the United States Bankruptcy Court for the Southern District of Texas. *See id.* Defendants moved to dismiss the Complaint in the bankruptcy court on February 14, 2025. *See* Dkt. Nos. 12, 17, and 20. On April 9, 2025, the Bankruptcy Court for the Southern District of Texas transferred the case to this Court. Dkt. No. 1-8. Defendants re-filed their motions to dismiss in this case on June 24, 2025. Dkt. Nos. 12, 17, and 20. Defendants William Hess, Nicholas Hewitt, and Catherine Landman filed a supplemental motion to dismiss on October 21, 2025. Dkt. No. 60. Defendant Younghoon Park

filed his motion to dismiss on November 14, 2025. Dkt. No. 72. Defendants' motions to dismiss are fully briefed and before the Court for decision.

## DISCUSSION

### I. THE TRUSTEE HAS STANDING TO PURSUE HIS CLAIMS AGAINST THE FORMER D&O DEFENDANTS AND ON BEHALF OF AT LEAST SOME OF THE ASSIGNED LENDERS

#### A. The Chapter 11 Plan's Release Provisions Do Not Require Dismissal of the Trustee's Claims

Former D&O Defendants Dubel, Gadbois, McRae, Wilkes, Hess, Hewitt, and Landman seek dismissal of the claims against them on the grounds that those claims were released by Instant Brands' confirmed Chapter 11 Plan, Dkt. No. 53-3 (the "Plan"). Dkt. No. 18 at 9; Dkt. No. 61 at 4. They argue that, pursuant to the releases in the Plan, the Trustee lacks standing to bring claims against them, and seek dismissal of those claims under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. Dkt. No. 18 at 1, 8; Dkt. No. 61 at 1 n.2. Because "[s]tanding is jurisdictional under Article III and is thus a threshold issue in all cases," Defendants' standing arguments must be addressed before their motions to dismiss on the merits. *Saba Cap. Master Fund, LTD. v. Blackrock ESG Cap. Allocation Tr.*, No. 23-8104, 2024 WL 3174971, at *2 (2d Cir. June 26, 2024).[3]

Although the Plan contains various release provisions, some of which would define these Defendants as "Released Parties," those provisions do not require dismissal of the claims in this case, at least not at the complaint stage. The Plan specifies that, even as to Released Parties, the release does not apply to, *inter alia*, "[c]laims or liabilities *arising out of or relating to any act or omission* of a Released Party that constitutes *willful misconduct (including actual fraud) or gross*

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

*negligence*." Plan at 150 (emphasis added).[4] In other words, if a claim arises out of or relates to a Released Party's own acts of willful misconduct, actual fraud, or gross negligence, then the claim cannot be covered by the release.

All of the Trustee's claims against Dubel, Gadbois, McRae, Wilkes, Hess, Hewitt, and Landman, at least as alleged, fall within the category of claims for which the releases do not apply. *See* Compl. at 67–71, 73–76, 77–81, and 85–86. The claims all arise out of the Special Dividend and related transfers, and the Trustee clearly alleges that each D&O Defendant engaged in conduct in connection with these events that, if proven, constitutes willful misconduct, actual fraud, or gross negligence. *See, e.g.*, *id.* ¶ 95 (Directors engaged in acts of self-dealing in connection with the Special Dividend); *id.* ¶ 106 (Instant Brands' management knowingly inflated financials in marketing the Special Dividend); *id.* ¶ 109 (Directors "willfully and fraudulently approv[ed] a conflicted transaction that enriched themselves as insiders" by voting to approve the 2021 Dividend Recap). *See also In re Fusion Connect, Inc.*, 634 B.R. 22, 33 n.2 (S.D.N.Y. 2021) ("[T]he Supreme Court has emphasized that the term 'actual fraud' is to be read broadly: Anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" (quoting *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360 (2016))); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012) ("Gross negligence is the standard for evaluating a breach of the duty of care [owed by fiduciaries].").

Defendants seek to circumvent this carve-out in the releases by arguing that "the Complaint does not plausibly allege actual fraud, willful misconduct, or gross negligence." Dkt. No. 18 at 10. But that argument goes to the merits of the claims and not whether the Trustee has standing to bring them. Because the Court must accept all well-pleaded allegations as true at this

[4] Page cites refer to the PDF page numbers of Dkt. No. 53-3.

stage, and because those allegations, if true and proven, would constitute willful misconduct, actual fraud, or gross negligence, these claims cannot be dismissed for lack of standing.

### B. The Trustee Has Demonstrated He Has Standing to Bring Tort Claims on Behalf of at Least Some of the Assigned Lenders

Defendants further allege that the Trustee lacks standing to bring his tortious interference with contract and fraudulent inducement claims, which are brought solely on behalf of the Assigned Lenders. According to Defendants, the Trustee has not sufficiently alleged that he was assigned the lenders' claims. *See, e.g.*, Dkt. No. 18 at 2. "New York's statute governing the assignment of claims provides that 'any claim can be transferred.'"[5] *Digizip.com, Inc. v. Verizon Servs. Corp.*, No. 14-CV-01741 (GWG), 2015 WL 1283676, at *3 (S.D.N.Y. Mar. 20, 2015) (quoting N.Y. Gen. Oblig. L. § 13-101).[6] To assign a claim, "the assignor must 'manifest an intention to make the assignee the owner of the claim.'" *Id.* (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997)). This allowance extends to tort claims, which "are freely assignable in New York, provided that there is some expressed intent or reference to tort causes of action, or some explicit language evidencing the parties' intent to transfer broad and unlimited rights and claims." *PS US LLC v. Moulding*, No. 21-CV-01049 (VEC), 2021 WL 5597152, at *2 (S.D.N.Y. Nov. 30, 2021).

In response, the Trustee has appended to his opposition the original Master Consent to Assignment letter, which lists the lenders who participated in the primary syndication and is

[5] N.Y. Gen. Oblig. Law § 13-101 exempts certain claims from assignment, but those exceptions are inapplicable here.

[6] The Court applies the state law briefed by the parties for each claim. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("implied consent" through the parties' briefs to a particular state's law "is sufficient to establish choice of law").

signed by Jeffries Finance LLC and Instant Brands.[7] Dkt. No. 22-1. He has also appended the May 8, 2024 Assignment Agreement between Jefferies Leveraged Credit Products LLC, several Citadel entities, several Monroe entities, and a Saratoga entity, as assignors, and the Instant Brands Litigation Trust as assignee. The assignors agreed to "assign, transfer, convey and deliver to Assignee any and all of Assignors' rights, title and interest in any and all prepetition Causes of Action of any kind whatsoever that the Assignors hold, may hold or may assert, individually or collectively." Dkt. No. 22-2 at 1–2. Cause of Action[8] is defined broadly to include "any claim . . . in contract, tort, law, equity, or otherwise pursuant to any theory of law." *Id.* at 30.

The May 8, 2024 agreement "manifest[s] an intention" to make the Litigation Trustee the owner of claims held by Jeffries Leveraged Credit Products LLC, Citadel, Monroe, and Saratoga. *Digizip.com, Inc.*, 2015 WL 1283676, at *3. It is unclear, however, what rights or claims Jeffries Leveraged Credit Products LLC and the Citadel entities have to assign. Based on the Master Consent to Assignment, none of these entities were original lenders or participated in the initial syndication of the Term Loan. In addition, the Trustee has not provided any information as to how Jeffries Leveraged Credit Products LLC and the Citadel entities came to hold any Assigned Lender claims, or what the terms of those transactions may have been, including whether they transferred any tort claims. These gaps may well mean that the Trustee cannot seek recoveries based on damages sustained by these entities, should the Trustee prove liability on the Assigned

[7] When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court "may consider evidence outside the pleadings." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

[8] Capitalized Terms in the May 8, 2024 agreement hold the definition assigned to the term in the Chapter 11 Plan. Dkt. No. 22-2 at 2.

Lender claims. However, the Court need not decide that question today.[9] The Trustee has sufficiently shown that two signatories to the May 8, 2024 Assignment Agreement were participants in the original lender group, who the Complaint alleges were targets of the misrepresentations and omissions that underlie the fraudulent inducement claim, and were harmed by Cornell Capital's alleged tortious interference with the Term Loan credit agreement when it induced Instant Brands' breach of that agreement through the Unsub Transaction. The clear assignment of the tort claims of Monroe and Saratoga to the Trustee are sufficient to establish his standing to bring the tortious interference and fraudulent inducement claims, at least as to those two Assigned Lenders.

## II. THE COMPLAINT SUFFICIENTLY STATES ITS CLAIMS

### A. Legal Standard on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

### B. Constructive Fraudulent Conveyance Claims

New York's Debtor and Creditor Law ("N.Y. D.C.L.") renders a transfer constructively fraudulent if it is made "without receiving a reasonably equivalent value in exchange," and one of the following circumstances is met: (1) the debtor "was engaged or was about to engage in a

[9] If the Trustee believes he can establish that this Jeffries entity and the Citadel entities have rights to bring these tort claims, he may seek leave to amend the Complaint to establish those facts.

business or transaction for which the remaining assets of the debtor were unreasonably small," N.Y. D.C.L. § 273(a)(2)(i); or (2) the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due," *id.* § 273(a)(2)(ii). Furthermore, "[c]onstructive fraudulent transfer claims under the Bankruptcy Code and N.Y. DCL generally require that, at the time of the transfer, the transferor was either insolvent or in dire straits financially." *In re Mendinghall*, No. 24-35112 (KYP), 2026 WL 1034442, at *5 (Bankr. S.D.N.Y. Apr. 15, 2026). The Trustee alleges that the four transfers that are the subject of the Complaint—the Parent Transfer, Seller Notes Transfer, Special Dividend, and Unsub Transaction—were constructively fraudulent under these provisions. The Trustee also brings these claims under Sections 544(b) and 550 of the Bankruptcy Code, which allow a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim" and allow for recovery of a voided transfer. 11 U.S.C. §§ 544(b)(1), 550.[10]

### 1. The Special Dividend and Parent Transfer

The Trustee alleges that both the Special Dividend and the Parent Transfer were made without consideration. Compl. ¶¶ 93, 196, 204. Defendants argue that these transfers were not fraudulent conveyances because they did not render Instant Brands insolvent.[11] *See* Dkt. No. 13 at 29–32. N.Y. D.C.L. defines a debtor as insolvent if, "at a fair valuation, the sum of the

---

[10] Defendants argue that the Trustee fails to define the transfers he seeks to avoid. Dkt. No. 13 at 28. As set forth in Section I(C) & (D) of the Background, each of the subject transfers is clearly described, and even depicted in pictorial form, in the Complaint. *See* Compl. at 34.

[11] Defendants argue that the Trustee "neither defines what the 'Special Dividend' is, nor which specific entity allegedly made it." Dkt. No. 13 at 28. Again, the Complaint sufficiently defines the Special Dividend, alleging that it "resulted in transfers of approximately $206 million" and identifying specific recipients of the transfer by amount received. Compl. ¶¶ 166–68.

debtor's debts is greater than the sum of the debtor's assets." N.Y. D.C.L. § 271(a). "Insolvency is ordinarily a question of fact," *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 364 (Bankr. S.D.N.Y. 2024), and is determined at "the time at which the transfer took place," *Ray v. Ray*, No. 18-CV-07035 (GBD), 2019 WL 1649981, at *6 (S.D.N.Y. Mar. 28, 2019), *aff'd*, 799 F. App'x 29 (2d Cir. 2020). "An adequate pleading of insolvency requires some sort of balance sheet information that the Court can use to infer that the corporation's liabilities exceeded their assets" at the time of the transfer. *Innovative Custom Brands, Inc. v. Minor*, No. 15-CV-02955 (AJN), 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016).

Here, the Trustee has pled sufficient facts and "balance sheet information" to establish at the pleading stage that Instant Brands was rendered insolvent by the Special Dividend. *Id.* The Trustee alleges that the Special Dividend was approved, in part, in reliance on the "Solvency Memo." Compl. ¶ 116. The Solvency Memo specifically analyzed "whether the fraudulent conveyance standards have been met" by the Special Dividend. Dkt. No. 14-12 at 5. To assess potential insolvency, the Solvency Memo analyzed "the fair value of the assets of each Company and the total liabilities of each Company (after giving effect to the applicable Dividend) to determine whether the sum of such Company's debt and liabilities . . . does not exceed the fair market value" of the Company's present assets. *Id.* at 5–6. The Solvency Memo estimated that Instant brands would have $1,178,624,000 in assets and $868,828,000 in liabilities following the transfer, creating a positive differential of $309,796,000. *Id.* at 8.

However, the Trustee alleges that several of these estimates were wildly inaccurate. First, according to the Complaint, goodwill—which was intended to reflect "the difference between the purchase price and the assets acquired"—should have been "reduced to reflect the alleged approximately $270 million overpayment" for Instant Brands. Compl. ¶ 12. Thus, based

on the Trustee's allegations, the $242,079,000 value ascribed to "Goodwill" should have been zero. Dkt. No. 14-12 at 8; Dkt. No. 22 at 13. This change alone would have left only a $67,717,000 differential between the Company's assets and liabilities following the Special Dividend. The Trustee also alleges that the "Intangible Assets" on the balance sheet were significantly overvalued. *See, e.g.*, *id.* ¶¶ 12, 83, 85. Although the Trustee does not allege the precise figure by which the Intangible Assets should have been reduced, even a relatively modest reduction of their $413,976,000 valuation in the Solvency Memo would have created a balance sheet in which the Company's liabilities outweighed its assets. *See* Dkt. No. 14-12 at 8. Accordingly, the Trustee has plausibly alleged that the Special Dividend and Parent Transfer rendered Instant Brands insolvent.[12] Furthermore, the allegations concerning the Solvency Memo establish that Instant Brands "reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due," N.Y. D.C.L. § 273(a)(2)(ii), given the Trustee's allegations about what an accurate balance sheet would have shown, as well as what accurate projections of future revenue would have shown about ability to pay.

**2. The Seller Notes Transfer**

The Trustee further claims that the subsequent Seller Notes Transfer can be avoided under Section 550 of the Bankruptcy Code because the recipients of that transfer were the immediate or mediate transferees of the initial fraudulent transferee. Compl. ¶ 208. "Bankruptcy Code section 550(a) permits the trustee to recover the avoided transfer from the

[12] Where, as here, a claim is based on multiple theories of liability, a plaintiff "need only plausibly plead one theory for the claim to survive dismissal." *Talkdesk, Inc. v. Unique Travel Corp.*, No. 23-CV-09543 (JPC), 2024 WL 4904684, at *3 n.5 (S.D.N.Y. Nov. 27, 2024) ("A cause of action that is based on one set of facts but that contains multiple, alternative legal theories supporting relief is still just one claim."). Because the Trustee has plausibly alleged a claim that the Special Dividend reflects a constructive fraudulent conveyance under N.Y. D.C.L. § 274(a), the Court need not address Plaintiff's other theories of liability.

initial transferee or any immediate or mediate transferee of the initial transferee." *In re Stephens*, No. 21-42857, 2024 WL 74897, at *17 (Bankr. E.D.N.Y. Jan. 5, 2024). To plead a subsequent transfer, "the complaint must allege facts that support the inference that the funds at issue originated with the debtor . . . and contain the necessary vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015).

The Trustee's claims regarding the Seller Notes Transfer meet this standard. According to the Trustee, the Parent Transfer originated with an Instant Brands subsidiary, transferred $345 million in funds to a different Instant Brands subsidiary, and then paid the funds in the form of a dividend to the parent company of the Instant Brands companies. Compl. ¶¶ 56, 93. The parent company then paid out the $345 million which included a payment of approximately $100 million to repay the Seller Notes. *Id.* ¶¶ 93, 180. These allegations support the inference that the $100 million transferred through the Seller Notes Transfer originated with Instant Brands and indicates the "who, when, and how much" of the subsequent transfers. *Sec. Inv. Prot. Corp.*, 531 B.R. at 473.

### 3. The Unsub Transaction

The Unsub Transaction involved the transfer of assets valued at approximately $200 million from Instant Brands to newly formed unrestricted subsidiaries. Compl. ¶ 147. This transfer served as collateral for a $55 million loan from Cornell Capital Partners LP. *Id.* Defendants argue that the transfer—as alleged—does not satisfy the standard of a constructive fraudulent transfer because the Complaint does not establish that the transfer was made without receiving a reasonably equivalent value in exchange. Dkt. No. 13 at 38. The Court disagrees. Although it is true that "the grant of collateral for a legitimate antecedent debt is not, without

more, a constructive fraudulent conveyance," *In re Marketxt Holdings Corp.*, 361 B.R. 369, 398 (Bankr. S.D.N.Y. 2007), here the Trustee has alleged a transfer of nearly four times the value of the loan in purported "collateral." These allegations, in addition to the Trustee's allegations about the true purpose of the loan and the asset transfer, are sufficient to allege that the Unsub Transaction was made for less than reasonably equivalent value.

**C. Actual Fraudulent Conveyance Claims**

The Trustee alleges that the Parent Transfer, Seller Notes Transfer, Special Dividend, and Unsub Transaction also constituted actual fraudulent transfers pursuant to N.Y. D.C.L. §§ 273–75 and Sections 544 and 550 of the Bankruptcy Code. Compl. at 67–73. N.Y. D.C.L. § 273(a)(1) sets forth the legal standard for actual fraudulent conveyances under New York law: "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor." "In determining whether the transferor had the requisite intent under DCL § 273(a)(1), courts consider a number of factors, which codify common law 'badges of fraud.'" *Diaz v. Dora Maar USA Inc.*, No. 25-CV-06868 (LJL), 2026 WL 880515, at *6 (S.D.N.Y. Mar. 31, 2026). These include:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was undisclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor

> transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*Id.* Additionally, claims pursuant to N.Y. D.C.L. § 273(a)(1) are "subject to Rule 9(b)'s heightened pleading standards." *Red Rock Sourcing LLC v. JGX LLC*, No. 21-CV-01054 (JPC), 2024 WL 1243325, at *40 (S.D.N.Y. Mar. 22, 2024). However, "[b]ecause of the difficulties in proving intent to defraud, a pleader may rely on 'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021).

**1. The Special Dividend, Parent Transfer, and Seller Notes Transfer**

The Trustee alleges that the Special Dividend, Parent Transfer, and Seller Notes Transfer conducted in April 2021 were actual fraudulent transfers. The Complaint sufficiently pleads actual fraudulent transfers pursuant to N.Y. D.C.L. § 273(a)(1) in connection with these transactions by alleging the existence of several badges of fraud. First, the Trustee alleges that the Parent Transfer and Special Dividend were made to insiders. *See, e.g.*, Compl. ¶ 176 (alleging that the Parent Transfer was made from OpCo (Instant Brands' operating company) to Intermediate HoldCo to its parent company TopCo); *id.* ¶ 167 (alleging that the Special Dividend transferred funds to Instant Brands' directors and officers). Second, as set forth above, the Trustee alleges that Instant Brands was rendered insolvent by the transactions. Third, the Trustee alleges that Instant Brands purposefully concealed its true liabilities and assets through the allegedly inaccurate Solvency Memo. *Id.* ¶ 12. These allegations are sufficient to establish an inference of fraudulent intent at the pleading stage. *See Seagrape Invs. LLC v. Tuzman*, No. 21-CV-07517 (RA), 2024 WL 4337448, at *16 (S.D.N.Y. Sept. 26, 2024) (holding that a complaint satisfied the heightened pleading standard of Rule 9(b) by alleging badges of fraud, including the

transfer of funds to an insider and the transferring company's "poor financial condition"); *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th at 160.

**2. The Unsub Transaction**

Similarly, the Trustee alleges sufficient badges of fraud with respect to the Unsub Transaction to plead an actual fraudulent transfer. For example, the Trustee alleges that the Unsub Transaction "transfer[red] substantially all of [Instant Brands'] tangible assets" and "transferred the essential assets of the business to a lienor that was also an insider of the debtor." Compl. ¶¶ 14, 187. The Trustee also alleges that Instant Brands was insolvent even before the Unsub Transaction. *Id.* ¶ 187. The Trustee further alleges that the Transaction was marked by secrecy, haste, and other commercially unusual circumstances, including that it was approved by a "special committee" that was not an independent fiduciary, that was formed two days prior for the purpose of approving the transaction, and which appointed Cornell Capital's legal counsel as Instant Brands' legal counsel. *Id.* ¶¶ 149–51. The Trustee's allegations are thus sufficient to state a claim for actual fraudulent conveyance at the pleading stage. *See, e.g.*, N.Y. D.C.L. §§ 273(b)(5), (9), (11);[13] *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995) ("Actual fraudulent intent . . . may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."); *Anhui Aido Garment Co., Ltd. v. Stern*, No. 24-CV-01572 (JGK), 2025 WL 1663860, at *7 (S.D.N.Y. June 12, 2025) (denying a motion to dismiss actual fraudulent conveyance claims where the complaint "alleged the existence of several badges of fraud").

[13] Although the N.Y. D.C.L. was amended for claims after April 4, 2020, "[t]he standard [for actual fraudulent conveyance] is substantially the same under the former law." *Anhui Aido Garment Co., Ltd. v. Stern*, No. 24-CV-01572 (JGK), 2025 WL 1663860, at *7 (S.D.N.Y. June 12, 2025).

**D. Illegal Dividend**

The Trustee alleges that the Special Dividend amounted to an illegal dividend under New York and Delaware law. Compl. ¶ 228. Delaware's General Corporation Law ("DGCL") provides that corporate directors "may declare and pay dividends upon the shares of its capital stock either: (1) Out of its surplus" or "(2) In case there shall be no such surplus, out of its net profits for the fiscal year." DGCL § 170. The DGCL also prohibits "payment of dividends while the corporation is insolvent or which will render it insolvent." *Pereira v. Farace*, 413 F.3d 330, 335 (2d Cir. 2005). Defendants argue the Trustee has not pled that the Special Dividend depleted Instant Brands' surplus. Dkt. No. 13 at 35. But, as set forth above, the Trustee has plausibly alleged that the Special Dividend rendered Instant Brands insolvent, and that the financial condition of the company was such that there was no "surplus" or "net profits" from which a lawful dividend could be paid. Such allegations are sufficient to state a claim for an illegal dividend at the pleading stage.

**E. Breach of Fiduciary Duty**

The Trustee alleges that certain Cornell Defendants, Former D&O Defendants, and Seller Defendants breached their fiduciary duty in connection with both the Special Dividend and Unsub Transaction. Compl. at 78–81. To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege "(1) the existence of a fiduciary duty, and (2) the breach of that duty." *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012). "Directors of Delaware corporations have long been said to owe a triad of fiduciary duties to the corporation and its shareholders: (1) the duty of care, (2) the duty of loyalty, and (3) the duty to act in good faith," which is a "subsidiary element of the duty of loyalty." *In re Tops Holding II Corp.*, 646 B.R. 617, 697 (Bankr. S.D.N.Y. 2022).

Defendants claim that the Trustee's breach of fiduciary duty claims must be dismissed because the Director and Officer Defendants were exculpated from duty of care claims. Dkt. No. 13 at 44; Dkt. No. 18 at 11; Dkt. No. 20 at 22. But even if Defendants were exculpated from duty of care claims, that would not warrant dismissal of the claim for breach of fiduciary duty because the Trustee also alleges a breach of the duty of loyalty, which cannot be exculpated. Compl. ¶ 237; *see also Orman v. Cullman*, 794 A.2d 5, 41 (Del. Ch. 2002) ("[A] breach of [the duty of loyalty] results in liability that cannot be avoided by an exculpatory provision."). The duty of loyalty "mandates that the best interest of the corporation and its shareholders take[] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). "Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994). "A plaintiff will commonly plead duty of loyalty claims by alleging that the director (1) was self-interested in the transaction at issue, or (2) acted to advance the self-interest of an interested party from whom they could not be presumed to act independently." *In re Tops Holding II Corp.*, 646 B.R. at 697.

The Trustee's allegations concerning the Special Dividend meet these elements. At bottom, the Trustee alleges that (1) the Special Dividend rendered Instant Brands insolvent; and (2) eight of the nine directors (or the entities they represented) who approved the Special Dividend "would together directly receive the vast majority of the $345 million dividend."

Compl. ¶ 109.[14] These allegations present the "classic example that implicates the duty of loyalty" because the approving directors of the dividend were the direct or indirect financial beneficiaries of the transaction. *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 751. As to the allegations against Officers Hewitt and Kist, the Trustee alleges, among other things, that they received six-figure bonuses from the Special Dividend's approval. Compl. ¶ 111 n.4. "The duties of good faith and loyalty require a fiduciary to avoid self-dealing." *Morgan Art Found. Ltd. v. Brannan*, No. 18-CV-08231 (AT) (BCM), 2020 WL 469982, at *23 (S.D.N.Y. Jan. 28, 2020). These duties "are identical to those owed by corporate directors" for corporate officers like Hewitt and Kist. *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009). The Trustee alleges that Hewitt and Kist breached the duty of loyalty by profiting from the Special Dividend, and, as to Hewitt, preparing supporting documents that he should have known were not accurate and were designed to provide cover for a transaction that was not in the company's interests. Compl. ¶ 111. This claim is sufficient to allege a breach of fiduciary duty.[15]

Similarly, the Trustee has sufficiently pled a breach of the duty of loyalty with respect to the Unsub Transaction. The Unsub Transaction also involved directors on both sides of the transaction because certain directors, Henry Cornell, Justine Cheng, and Rodrigo Bravo, were employed by Cornell Capital and the transaction was entered into for the clear benefit of Cornell Capital. Dkt. No. 22 at 70. Moreover, the Complaint also alleges that directors who had

[14] Defendants argue that the Trustee improperly engages in group pleading. Dkt. No. 13 at 48–49. However, the Trustee has specifically identified the actions that each director took in violation of the duty of loyalty as well as the specific financial benefit each received from the transaction.

[15] Contrary to Defendants' claims, *see, e.g.*, Dkt. No. 18 at 12, the business judgment rule does not apply to the Trustee's breach of fiduciary duty claims because "[i]f corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction." *Avande, Inc. v. Evans*, No. 18-CV-0203 (AGB), 2019 WL 3800168, at *8 (Del. Ch. Aug. 13, 2019).

received payments from the Special Dividend did not wish to risk a clawback of their payments if Instant Brands entered bankruptcy within two years of those payments, and so the Unsub Transaction was structured primarily to protect the financial interests of Cornell Capital and other directors, to the detriment of Instant Brands, who transferred assets valued at four times the amount of the loan. *See, e.g.*, Compl. ¶ 14. The allegations about the Unsub Transaction are sufficient to allege a breach of the duty of loyalty.

**F. Aiding and Abetting Breach of Fiduciary Duty**

The Trustee alleges that Cornell Capital aided and abetted the Director and Officer Defendants' breaches of fiduciary duty in connection with the Special Dividend and Unsub Transaction. "The elements of aiding or abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; and (3) knowing participation in the breach by the non-fiduciary." *Rubin v. Posner*, 701 F. Supp. 1041, 1052 (D. Del. 1988). For the reasons set forth above, the Trustee has alleged the first two elements with respect to the Special Dividend and the Unsub Transaction. The Trustee claims that the Cornell Defendants knowingly participated in these breaches by controlling Instant Brands' board of directors. Compl. ¶ 245. Specifically, the Trustee alleges that "Cornell Capital controlled the Director and Officer Defendants through (i) its employment of certain Director and Officer Defendants; (ii) its ability to replace any director that did not adhere with Cornell Capital's demands; and (iii) offering financial incentives to the Director and Officer Defendants in exchange for pursuing courses of action in breach of their fiduciary duties." *Id.* The Cornell Defendants argue that these allegations are too conclusory to be credited. Dkt. No. 13 at 53. However, they are corroborated by other allegations in the Complaint. For example, the Complaint alleges that Cornell Capital intended to extract a major dividend from Instant Brands, Compl. ¶ 91, and that the Directors who approved the dividend received financial benefits from the dividend, *id.* ¶ 94.

These allegations support the claim that Cornell Capital offered financial incentives to the Director and Officer Defendants in exchange for agreeing to the challenged transactions. Based on these allegations, the Trustee has sufficiently set forth a claim for aiding and abetting a breach of fiduciary duty.

**G. Fraudulent Inducement**

As to the Assigned Lender claims, the Trustee alleges that the identified Defendants made misrepresentations and omissions that fraudulently induced the Assigned Lenders to enter into the Term Loan, primarily by intentionally misstating the financial condition of Instant Brands. Compl. at 85–86. To prove common law fraud under New York law, a plaintiff must show that "(1) the defendant made a materially false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). A claim for negligent misrepresentation "requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (N.Y. 2007). The Complaint sufficiently alleges each of these elements. The Trustee alleges in detail the intentional or negligent falsity of information about Instant Brands' value and financial condition that was provided to the initial group of lenders in the course of marketing the Term Loan. *See, e.g.*, Compl. ¶¶ 59, 67, 100–07. Defendants' arguments that their specific statements about the value of the company or its overall financial condition are "nonactionable opinion," Dkt. No. 13 at 16, are not grounded in the allegations of the Complaint, and, once again, amount to arguments

about their defenses or what they think the Trustee will be able to prove, which cannot be considered by the Court at the motion-to-dismiss stage.

Finally, the Complaint adequately alleges that the fraud Defendants had an obligation to disclose key facts to the lenders that they intentionally omitted. The "special facts" doctrine provides that a duty to disclose can arise where "one party possesses superior knowledge . . . or where one party has made a partial or ambiguous statement." *Koch v. Greenberg*, 626 F. App'x 335, 339 (2d Cir. 2015) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). The Complaint extensively details the allegedly true facts about Instant Brands' acquisition and true financial condition that were known to the relevant Defendants, were material to a lender, and were intentionally not disclosed to the lenders in the course of marketing and syndicating the Term Loan. *See, e.g.*, Compl. ¶¶ 96–107. Defendants' arguments that the lenders were sophisticated commercial parties or that they would not have relied on the company's representations but would have done their own investigation or that other information available to the lenders would have corrected any alleged omissions, misunderstand the task on a motion to dismiss. Defendants will have an opportunity to argue that the actual facts do not show reliance, or do not show that the alleged omissions were intentional or material, or any number of other defenses and counter-arguments, and they may ultimately be successful in some of those arguments. But the Court must limit itself to the question of whether the Complaint, if true, contains sufficient allegations to make out the elements of the claim. Here again, it does.

**H. Tortious Interference**

Finally, the Trustee alleges that Defendant Cornell Capital caused Instant Brands to breach the Term Loan credit agreement in various ways, by making certain representations in the agreement and by entering the Unsub Transaction, which the Complaint alleges was not a "Permitted Investment" under the terms of that agreement. Compl. ¶¶ 249–61. New York law

defines tortious interference with contract as requiring "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019).

The Trustee's allegations about false statements in the credit agreement regarding Instant Brands' financial condition and solvency (Sections 5.14 and 5.15) do not make out a tortious interference claim as a matter of law. Because tortious interference requires the existence of a valid contract, acts taken before that contract is entered into cannot constitute tortious interference, and later actions that, if taken at the time the statements were made, would have rendered them false, likewise do not turn what may be a fraudulent inducement claim into a tortious interference claim. However, the Trustee's allegations about the Unsub Transaction are sufficient to state a claim for tortious interference against Cornell Capital.

Cornell Capital makes three primary arguments in support of dismissal of the tortious interference allegations regarding the Unsub Transaction: (1) it cannot have tortiously interfered with the credit agreement because its involvement in the negotiation and its majority control of Instant Brands render it not a "stranger" to the agreement, Dkt. No. 13 at 23; (2) the Complaint insufficiently alleges that the Unsub Transaction was a breach of the credit agreement, *id.* at 24; and (3) Cornell Capital was entitled to interfere with the contracts of its subsidiaries, *id.* at 26. Each of these arguments fails.

First, at least based on the allegations in the Complaint, Cornell Capital is a "stranger" to the credit agreement as a legal matter. "One asserting a tortious interference claim must also show that the defendant was not a party to the contract with which he allegedly interfered." *TVT*

*Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 88 (2d Cir. 2005); *see also Bradbury v. Israel*, 204 A.D.3d 563, 564 (1st Dep't 2022) ("[O]nly a stranger to a contract, such as a third party, can be liable for tortious interference with a contract."). But Cornell Capital's enmeshed relationship with Instant Brands is not the same as it being a "party" to the contract within the meaning of New York's "stranger" rule. Neither majority shareholders nor entities with a measure of control over aspects of the contract are transformed into "parties" who cannot tortiously interfere under this rule. *See, e.g.*, *Island Two LLC v. Island One, Inc.*, No. 13-CV-02121 (LGS), 2013 WL 5380216, at *2–3 (S.D.N.Y. Sept. 26, 2013); *CoraMed USA, LLC v. Alexion Pharms., Inc.*, 695 F. Supp. 3d 251, 267–68 (E.D.N.Y. 2023).

Second, the Complaint adequately alleges that the Unsub Transaction breached Section 7.13 of the credit agreement. The parties' dispute centers largely on how the "Permitted Investments" section of the agreement should be interpreted; to the extent Cornell Capital's interpretation of those provisions is plausible, it would merely tee up a dispute about how the contract should be interpreted when the language admits of more than one plausible reading. This is not the kind of argument that can support dismissal at the pleading stage. While a court is not "obliged to accept the allegations of the complaint as to how to construe a contract . . . they should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021).

Third, even Cornell Capital's own cases hold that the "economic interest" exception only applies where a party's protection of his own interests does not "employ improper means," such as fraud or illegality. Dkt. No. 13 at 27. But, as discussed above, the Trustee has clearly alleged that the Unsub Transaction was designed and intended to protect the Special Dividend (of which Cornell Capital and its affiliated individuals were the largest beneficiaries) from the two-year

lookback period from a bankruptcy filing, and that it was undertaken with deliberate indifference to the interests of the company and of the Term Loan lenders. This is sufficient at the complaint stage to plead that the economic interest exception does not apply.

Accordingly, the Trustee has adequately pled a tortious interference claim as to the Unsub Transaction.

**CONCLUSION**

For all of the reasons stated above, Defendants' motions to dismiss are DENIED. The motion to stay discovery is DENIED AS MOOT.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 12, 17, 20, 60, 72, and 86.

Dated: August 5, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge